IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 118,663

In the Matter of L.J. BUCKNER, JR.,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed June 29, 2018. Disbarment.

*Penny R. Moylan*, Deputy Disciplinary Administrator, argued the cause, and *Stanton A. Hazlett*, Disciplinary Administrator, was with her on the formal complaint for the petitioner.

*John J. Ambrosio*, of Ambrosio & Ambrosio, Chtd., of Topeka, argued the cause, and *L.J. Buckner, Jr.*, respondent, argued the cause pro se.

PER CURIAM: This is a contested original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, L.J. Buckner, Jr., of Lenexa, an attorney admitted to the practice of law in Kansas in 1994. After respondent appeared in person and through counsel for a hearing before the panel of the Kansas Board for Discipline of Attorneys, the panel determined he violated Kansas Rules of Professional Conduct (KRPC) 1.4(b) (2018 Kan. S. Ct. R. 293) (communication); 1.5(d) (2018 Kan. S. Ct. R. 294) (fees); 1.15(a), (b), (c), (d)(1)(ii), (d)(3), and (f) (2018 Kan. S. Ct. R. 328) (safekeeping property); 1.16(d) (2018 Kan. S. Ct. R. 333) (termination of representation); 8.1(b) (2018 Kan. S. Ct. R. 379) (failure to respond to lawful demand for information from a disciplinary authority); and Kansas Supreme Court Rule 207(b) (2018 Kan. S. Ct. R. 246) (failure to cooperate in disciplinary investigation). The hearing panel also found that the respondent did not violate KRPC 1.3 (2018 Kan. S. Ct. R. 292) (diligence) and KRPC 8.4 (2018 Kan. S. Ct. R. 381) (misconduct).

1

Before the panel, the Disciplinary Administrator recommended that the respondent be disbarred. Respondent's counsel acknowledged respondent's conduct supported suspension. The hearing panel unanimously recommended that the respondent be suspended for two years and, if the respondent seeks reinstatement, that he be required to undergo a reinstatement hearing under Supreme Court Rule 219 (2018 Kan. S. Ct. R. 264).

Pursuant to Supreme Court Rule 211(f) (2018 Kan. S. Ct. R. 251) and Supreme Court Rule 212 (2018 Kan. S. Ct. R. 255), the Disciplinary Administrator filed a Notice of Appeal and Exceptions to the Hearing Panel Report, arguing the hearing panel's findings of fact support a conclusion of law that the respondent violated KRPC 8.4(c). In the alternative, the Disciplinary Administrator argued that the clear and convincing evidence of record established that respondent violated KRPC 8.4(c). Furthermore, in recommending discipline, the Disciplinary Administrator took exception to the hearing panel's findings that: (1) respondent's violations were committed knowingly, rather than intentionally and (2) that respondent's behavior was motivated by selfish conduct, rather than selfish *and* dishonest conduct.

Respondent did not file exceptions to the panel's final hearing report; therefore, the panel's findings of fact are deemed admitted. Supreme Court Rule 212(c), (d); see also *In re Hodge*, 307 Kan. 170, 209-10, 407 P.3d 613 (2017) ("When a respondent does not take exception to a finding it is deemed admitted.").

We unanimously hold that clear and convincing evidence supports each of the rule violations found by the panel. But we disagree with the panel's conclusion that respondent's conduct did not violate KRPC 8.4(c) and hold that the panel's findings of fact, as a matter of law, establish a violation of this rule.

The majority of this court holds disbarment is the appropriate discipline. A minority of this court would impose indefinite suspension and require the respondent to undergo a reinstatement hearing under Supreme Court Rule 219 at which Respondent would be required to prove that full restitution has been provided to his clients and the Client Protection Fund as factually applicable.

FACTS AND PROCEDURAL HISTORY

On November 10, 2016, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the KRPC; on May 1, 2017, that office filed a first amended formal complaint. Upon motion granted December 27, 2016, the formal hearing was continued. The respondent filed an answer to the complaint on January 23, 2017, and an answer to the first amended formal complaint on May 22, 2017. Respondent filed a proposed probation plan on May 1, 2017. A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on June 8, 2017, where the respondent was personally present and was represented by counsel.

Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

"*Findings of Fact and Conclusions of Law*

. . . .

"14.    On March 19, 2012, EverBank filed a foreclosure action against P.J. and D.R. On March 30, 2012, P.J. and D.R. retained Jordan O. Schwartz to represent them in the pending litigation. P.J. and D.R. agreed to pay Mr. Schwartz $500 for the first 30 days representation and $395 monthly during the course of the representation.

3

"15.     On April 16, 2012, Mr. Schwartz entered his appearance on behalf of P.J. and D.R.

"16.     Later, on February 4, 201[4], P.J. and D.R. replaced Mr. Schwartz and retained the respondent to defend them in the pending mortgage foreclosure action. Additionally, P.J. and D.R. directed the respondent to file a counterclaim against the mortgage company. Finally, P.J. and D.R. wanted to assert a punitive damages claim against the mortgage company.

"17.     P.J. and D.R. entered into a written fee agreement with the respondent. While the record does not include a fully executed agreement, the parties stipulated that the agreement found at Exhibit 1 is a true and accurate copy of the written fee agreement which was fully executed by the respondent, P.J. and D.R.

"18.     On February 7, 2014, the respondent sent P.J. and D.R. an email message which provided:

> 'I have attached my engagement letter as promised. It is different than the document that I provided to you before but is intended to be reasonable and ethical.
>
> 'My expectation is that you all would pay me $500 per month plus expenses. I have framed that as a monthly cap or monthly flat fee. I will keep track of my time in a traditional format but cap the legal fee portion as $500. I believe that doing so will allow me to treat all of your payments as earned when received as a practical matter. The way the prior document was crafted seems to leave that door open. It will also force me to keep track of my time in case we are successful in recovering fees and expenses from persons other than you. I kept much of the success fee language the same.'

Despite the respondent's statement in the email message, the respondent did not keep contemporaneous time records. The written fee agreement included the following:

4

'1.     This Agreement is effective February 4, 2014 and Buckner had no obligation to provide legal services to Clients prior to that time.

'2.     Clients are hiring Buckner to represent them in a pending mortgage foreclosure law matter now pending in Johnson County, Kansas District Court filed by EverBank against Clients and others (12CV2253). . . .

. . . .

'5.     Buckner's hourly rate for this matter [*sic*] $300.00 per hour. Clients agree to pay by the hour at Buckner's prevailing rates for all time spent on Clients' matter by Buckner's legal personnel. Thus, these rates are subject to change upon written notice from Buckner. L.J. Buckner, Jr. will be the person primarily working on this matter. Time charged may include the time Buckner spends on telephone calls relating to Clients' matter, including calls with Clients, witnesses, opposing counsel or court personnel. Buckner may charge for waiting time in court and elsewhere and for travel time, both local and out of town. Client's payments to Buckner for legal fees generally shall be capped at $500.00 per month or any portion thereof with such payments being due on or about the 10th of each month ("Monthly Flat Fee"). All such payments shall be applied against Buckner's outstanding fees. **Buckner is entitled to and may recover the full amount of his billed fees from persons other than Clients through attorney's fee provisions or sanctions or the like.**

'If Buckner is successful in reducing the Four Hundred Seventy-Two Thousand and no/100 dollar ($472,000.00) principal balance of Clients' loan secured by a mortgage on Clients' Property (as described in Paragraph 4 of EverBank's Petition to Foreclose Mortgage), you agree that Buckner shall be entitled to a success [fee] ("Success Fee") equal to twenty percent (20%) of the principal reduction, which Success Fee shall be evidenced by a promissory note ("Success Fee Note") signed by Clients that shall be secured by a junior mortgage on Clients' Property. If

Clients were not personally liable on the mortgage note being compromised forming the basis for the Success Fee; the Success Fee Note will likewise provide no personal liability on the Success Fee Note. . . .

'6.     Buckner will incur various costs and expenses on Clients' behalf in performing legal services under this Agreement. **Clients agrees [*sic*] to pay for all costs and expenses paid or owed by Clients in connection with this matter and that Buckner had advanced on Clients' behalf but have not been previously paid or reimbursed to Buckner in addition to the hourly fees described above in paragraph 5.** Costs and expenses commonly include court fees; jury fees; service of process charges; court and deposition reporters' fees; photocopying and reproduction costs; notary fees; long-distance telephone charges; messenger and other delivery fees; postage; deposition costs; travel costs including parking and mileage, transportation meals and hotel costs; investigation expenses; consultant, expert witness, professional mediator, arbitrator and/or special master fees and other similar items. Except for the items listed below, costs and expenses will be charged at Buckner's cost.

. . . .

'7.     Buckner will send Clients periodic billing statements for costs and expenses incurred in connection with this matter. The statements will include the amount, rate, basis of calculation or other method of determining the fees and costs. Costs will be clearly identified by item and amount. Each statement, considering Paragraph 5 above, is to be paid in full within 30 days after the date of such statement.

. . . .

'10.     When Buckner's service concludes, all previously unpaid fees, costs and expenses will immediately become due and payable. Buckner

6

is authorized to use any funds held in Buckner's trust account as a deposit (advanced fee) against costs to apply to such unpaid fees, costs and expenses. After Buckner's services conclude, upon request, Clients' file and property will be delivered to Clients whether or not Clients has [*sic*] paid any fees and/or costs owed to Buckner. Clients understands [*sic*] that to the limited extent Buckner had paid out-of-pocket expenses for items that have not yet been reimbursed by Clients, Buckner may be reimbursed for that particular expense before releasing that item.

'11.     This Agreement contains the entire agreement of the parties. No other agreement, statement or promise made on or before the effective date of this Agreement will be binding on the parties.'

"19.     D.R. responded to the respondent's message, at 7:17 p.m. that same day, as follows:

'We just want to clarify the definition and circumstances of the success fee.

'That is reasonable in principle. (We are all for incenting you).

'One thing is that is [*sic*] dependent on our accepting the offer from the "bank."

'For example, if they offer a $60,000 principal reduction, and we refuse that offer, then we would not owe a success [fee] (e.g. of $12K).

'To be clear, for any modification to be worth keeping the house and commence a modified payment schedule, it is the total amount of remaining indebtedness that matters.'

In accordance with the fee agreement, P.J. and D.R. made 17 monthly payments of $500.00 to the respondent for his attorneys fees, from February, 2014, through June, 2015.

7

"20.    On February 19, 2014, the respondent entered his appearance on behalf of P.J. and D.R. in the pending litigation filed by EverBank. The litigation proceeded and the court scheduled trial by jury for August 3, 2015.

"21.    On July 23, 2015, the respondent filed a motion for leave to amend the counterclaims. On July 29, 2015, the court denied the respondent's motion for leave to amend the counterclaims. The Honorable Kevin Moriarty, District Court Judge for Johnson County explained:

'. . . Buckner did file a late request to amend his counterclaims and add punitive damages. He was clearly out of time. The final pretrial had already been heard and the trial issues were set. I had previously ruled there was not sufficient evidence to establish a fraud claim, so it was dismissed. There were no other claims for me to allow punitive damages. He still had his KCPA claims and he could have gotten attorney's fees and $10,000 per claim, if he prevailed.

'He did file a late request to allow punitive [*sic*] but it was never heard to the best of my knowledge because they settled the case. Everyone knew I would never allow someone to amend their petition a few days before trial. I can see how the borrowers believe he filed the request for punitive [*sic*] out of time, because he did with the motion to amend but I had already dismissed the only claim that would have allowed punitive damages, hence that is why he was trying to amend.'

"22.    On July 27, 2015, the respondent completed his annual attorney registration form with the Clerk of the Kansas Appellate Courts. At that time, the respondent notified attorney registration that he no longer had an attorney trust account.

"23.    The parties entered into settlement negotiations. On July 30, 2015, the mortgage company offered to settle the case by paying P.J. and D.R. $25,000. The respondent forwarded the offer to P.J. and D.R. by email:

8

'Settlement gives certainty.

'Last week there was concern that a deficiency judgment was POSSIBLE. By now, you may think that a deficiency judgment is improbable anyway. My point is that the settlement agreement provides certainty about deficiency.

**'Under the settlement agreement as it stands, you would have been in your house for 5 years without making a payment. Owe nothing to EverBank and have $25K in your pocket if the loss mitigation options were not acceptable to you.**

'I have raised some issues with BC—what is the universe of loss mitigation options at this point (reminding them of how we got into this mess in the first place), mutual releases (as it stands, we release all claims against us [*sic*] but they aren't releasing any claims against us), indemnification (we don't want anyone else claiming entitlement to enforce the note).

'But the bigger issues are the amount paid and the fall back reinstatement option—which is a worst case scenario. I'll remind them that we submitted an RMA when this case was filed that OCWEN said it could not process.'

"24.     P.J. and D.R. declined the mortgage company's offer and countered with $100,000. The mortgage company then offered $49,999. P.J. and D.R. made an additional offer to the mortgage company for $75,000. The mortgage company did not accept P.J. and D.R.'s offer. P.J. and D.R. agreed to accept $49,999, with the understanding that after the respondent's expenses were paid, they would receive the balance of the settlement proceeds.

"25.     On July 31, 2015, P.J. and D.R. accepted the mortgage company's settlement offer. The mortgage company agreed to pay P.J. and D.R. $49,999.00, and P.J. and D.R. agreed to surrender their home to the mortgage company.

9

"26.    On August 20, 2015, in anticipation of receiving the settlement check, P.J. sent the respondent an email message and suggested that the respondent's August, 2015, attorney fee of $500 be taken out of the settlement proceeds. Additionally, at that time, P.J. asked the respondent to provide a list of outstanding expenses.

"27.    On August 21, 2015, the respondent provided P.J. and D.R. with a list of outstanding expenses. There was a dispute as to one expense, the costs associated with the Garfield deposition.

"28.    On August 24, 2015, OCWEN Loan Servicing, LLC issued check number 1663558 made payable to the respondent in the amount of $49,999.00, to settle the matter.

"29.    On August 26, 2015, the respondent sent P.J. and D.R. an email message which provided:

'Nicol has informed me that he has possession of the check—see attached.

'Once I get it, I will deposit it and disburse funds when they are available.

'Presumably, if it doesn't go out tonight, I will go pick it up from him tomorrow.

**'I don't like to count my chickens before they hatch, I will put together a disbursement summary that, hopefully, we can agree upon and we will have this part behind us.'**

The respondent never provided a disbursement summary.

"30.    On August 29, 2015, the respondent sent an email message to P.J., which provided:

10

'Check came Thursday. Deposited same day. Bank says hold released September 1. If so, you'll get paid the same day.

'I have not spent a dime of it.

'I am out of town today and Monday. Will get summary to you when I can.

'Nicol wants dismissal. Will get to him Monday as required.

'Will continue to try to negotiate friendly transfer of house.'

The respondent never provided P.J. and D.R. with a summary.

"31.    In late August or early September, 2015, the respondent told D.R. to consider him paid. The respondent, however, testified otherwise during the hearing on the formal complaint.

"32.    Because P.J. and D.R. were required to surrender their home, they were in immediate need of the settlement proceeds to pay for the expenses related to moving from their home. D.R. asked the respondent for an initial payment of $3,000 for moving expenses. On September 1, 2015, the respondent provided P.J. and D.R. with a check for $3,000 to cover moving expenses.

"33.    On September 1, 2015, P.J. sent the respondent an email message about wrapping up the matter. The next day, September 2, 2015, the respondent responded and asked how P.J. and D.R. proposed to allocating the remainder of the funds. That same day, P.R. sent the respondent a summary of how the settlement proceeds should be handled. After deducting for unpaid expenses, P.R. requested that the respondent disburse approximately $43,000 to P.R. and D.R. The respondent responded by email, 'Nice try. Let's chat.'

11

"34.     On September 3, 2015, the respondent wrote to P.J. and D.R., offering to disburse $13,654.37 to them while keeping $30,000 for himself. P.J. and D.R. rejected the respondent's proposal and demanded that the respondent forward the balance of the settlement proceeds after the expenses had been paid.

"35.     On September 4, 2015, the respondent explained that based on correspondence with P.J., he believed he was entitled to additional attorney fees. The respondent forwarded a number of email messages to P.J. and D.R. to support his position.

"36.     To date, the respondent has not disbursed any additional funds to P.J. and D.R.

"37.     On September 15, 2015, the respondent filed a motion to withdraw from the representation of P.J. and D.R. in the EverBank litigation.

"38.     On September 25, 2015, P.J. and D.R. filed a *pro se* motion for enforcement of settlement terms in the EverBank litigation, District Court of Johnson County, Kansas, case number 12CV2253. In the motion, P.J. and D.R. alleged:

'1.     Pursuant to the terms of the Settlement Agreement approved by the Court on September 3, 2015 (Exhibit A), Everbank made payment of $49,999.00. Said payment was made to Buckner, as attorney for [P.J. and D.R.].

'2.     On September 1, 2015, Buckner distributed $3,000 of the settlement funds to [P.J. and D.R.]. [P.J. and D.R.] have received no other amount of settlement funds.

'3.     Buckner, [P.J. and D.R.] entered to an engagement agreement on February 7, 2015, a copy of which is attached hereto as Exhibit B. Pursuant to the terms of the engagement agreement, [P.J. and D.R.] agreed to pay Buckner $500 per month, which they have done so

12

on time and without fail. The engagement agreement further provides Buckner is entitled to payment of an amount equal 20% of the amount by which the loan principal is reduced, if any, as a result of Buckner's representation. As there was not a principal reduction, the contingency upon which the obligation to pay an additional fee depended, did not occur.

'4.　　Despite numerous requests made by [P.J. and D.R.], Buckner has refused to deliver the remaining balance of the settlement funds. Upon information and belief, Buckner intends [*sic*] retain the balance of the Settlement funds for himself.

'5.　　To date, [P.J. and D.R.] have paid Bucker [*sic*] $163.16 via separate check to reimburse him [*sic*] out of pocket expenses related to travel to attend a deposition. Upon information and belief, the only remaining expense reimbursement [*sic*] due to Buckner is $1768.95 for Rashad Blanchard deposition transcript, and $1575.88 for Neil Garfield deposition transcript and video, and $500 for Legal Services rendered in August, 2015, which leaves a balance of $43,154.17 due to [P.J. and D.R.].

'6.　　During settlement negotiations with Everbank, while providing legal advice to [P.J. and D.R.], Buckner failed to disclose his intent to retain the funds for himself. Buckner did not inform [P.J. and D.R.] of his intent to retain the settlement funds, until after the Settlement Agreement was approved and the funds paid by Everbank.

'CONCLUSION

'WHEREFORE, it is respectfully requested that this Court grant [P.J. and D.R.]'s motion for enforcement of settlement agreement including the payment of $43,154.17 from Buckner to [P.J. and D.R.], pursuant to its inherent power and grant such other and further relief as to the Court seems just and proper in the circumstances.'

13

While the record is unclear, it appears that on November 2, 2015, the district court concluded that it did not have authority to rule on P.J. and D.R.'s motion.

"39.    P.J. and D.R. sought assistance from the Kansas City Metropolitan Bar Association Fee Dispute Program (hereinafter 'KCMBA FDP'). The KCMBA FDP contacted the respondent to participate in the fee dispute process. The respondent failed to participate in the fee dispute process. On October 6, 2015, Ashley Williamson, the KCMBA FDP Coordinator sent a letter to P.J. and D.R. In the letter, Ms. Williamson indicated that because the respondent did not respond to the inquiry and because the fee dispute program requires both parties to participate, the KCMBA FDP would not be taking any further action. The KCMBA FDP closed the file without resolution.

"Disciplinary Investigation

"40.    P.J. and D.R. filed a complaint against the respondent with the disciplinary administrator's office. On November 19, 2015, Kate Baird, deputy disciplinary administrator wrote to the respondent, enclosed a copy of P.J. and D.R.'s complaint, and directed the respondent to provide a written response to the complaint within 15 days. The respondent did not provide a written response to the complaint as directed.

"41.    On January 19, 2016, Ms. Baird again wrote to the respondent. Ms. Baird informed the respondent that the complaint had been docketed for investigation, informed the respondent that the complaint had been assigned to the Johnson County Ethics and Grievance Committee, and directed the respondent to provide a written response to the complaint within 20 days. The respondent failed to provide a written response to the complaint as directed.

"42.    On January 26, 2016, Karl G. Johnson wrote to the respondent, introduced himself as the attorney assigned to investigate P.J. and D.R.'s complaint, and directed the respondent to provide a copy of the written response to the complaint. The respondent failed to provide Mr. Johnson with a written response to the complaint as directed.

14

"43.     On February 5, 2016, Mr. Johnson again wrote to the respondent and directed the respondent to provide a copy of the written response to the complaint, no later than February 16, 2016. Mr. Johnson indicated that should the respondent not provide a written response to the complaint by February 16, 2016, Mr. Johnson would advise the disciplinary administrator's office that the respondent was unwilling to cooperate in the investigation of the complaint. The respondent failed to provide Mr. Johnson with a response to the complaint.

"44.     On February 17, 2016, Mr. Johnson and the respondent spoke by telephone. On February 25, 2016, Mr. Johnson memorialized the conversation in a letter to the respondent. Mr. Johnson directed the respondent to provide a copy of his written response to the complaint by March 15, 2016. The respondent failed to provide Mr. Johnson with a response to the complaint.

"Discussion of Fee Agreement as it Related to Settlement Proceeds

"45.     Before turning our attention to the alleged rule violations, it is important to analyze all the evidence presented regarding the understanding of the parties of the fee agreement as it related to the ultimate settlement of the litigation.

"46.     First, in the fee agreement, the parties agreed:

'5.     Buckner's hourly rate for this matter [*sic*] $300.00 per hour. Clients agree to pay by the hour at Buckner's prevailing rates for all time spent on Clients' matter by Buckner's legal personnel. Thus, these rates are subject to change upon written notice from Buckner. L.J. Buckner, Jr. will be the person primarily working on this matter. Time charged may include the time Buckner spends on telephone calls relating to Clients' matter, including calls with Clients, witnesses, opposing counsel or court personnel. Buckner may charge for waiting time in court and elsewhere and for travel time, both local and out of town. Client's payments to Buckner for legal fees generally shall be capped at $500.00 per month or any portion thereof with such payments being due on or about the 10th of

15

each month ("Monthly Flat Fee"). All such payments shall be applied against Buckner's outstanding fees. Buckner is entitled to and may recover the full amount of his billed fees from persons other than Clients through attorney's fee provisions or sanctions or the like.'

This provision of the fee agreement makes it clear that P.J. and D.R. had to pay a monthly 'cap' of $500. A cap means a limit on the amount the respondent can receive from P.J. and D.R. P.J. and D.R. were not responsible for any more than $500 per month. Without fail, P.J. and D.R. paid the $500 monthly attorney fee to the respondent.

"47.    P.J. and D.R. believed that they were required to pay the respondent $500 per month for the duration of the representation. P.J. and D.R. also believed that they were required to pay for all the expenses of the litigation. Under the fee agreement, P.J. and D.R. did not believe that they were required to pay the respondent any additional fees. P.J. and D.R. relied on the provision of the fee agreement that the respondent was 'entitled to and may recover the full amount of his billed fees from persons other than Clients through attorney's fee provisions or sanctions or the like.' P.J. and D.R.'s position was that the $49,999 settlement was not the result of 'attorney's fees or sanctions or the like.'

"48.    The respondent justified his position in retaining and spending the $43,000 because on different occasions, P.J. and D.R. indicated to the respondent that they wanted him to get his fees paid. Further, the respondent reasoned that the fee agreement provision allowed him to retain the settlement proceeds because the settlement proceeds came 'from persons other than Clients.'

"49.    From a careful review of the fee agreement, the fee agreement does not provide for how a money settlement would be divided between the respondent and P.J. and D.R. The fee agreement addresses the monthly cap, it addresses expenses, it addresses a potential success fee in the event the respondent was able to successfully negotiate a reduction in the overall indebtedness of P.J. and D.R., and, finally, it allows the respondent to recover his fees from persons other than P.J. and D.R. through an award of attorney fees or sanctions.

16

"50.     In order to determine whether the respondent violated the Kansas Rules of Professional Conduct, it is necessary to determine what is reasonable given the facts of this case.

"51.     In looking at all the evidence admitted at the hearing, the hearing panel concludes that the respondent was not entitled to retain the balance of approximately $43,000 left of the settlement proceeds after the expenses were paid. The hearing panel concludes that the respondent was not entitled to receive the full $43,000, based, in part, on the following pieces of evidence.

'a.     Under the fee agreement, P.J. and D.R. were required to pay the respondent $500 per month as well as all the expenses incurred in the litigation.

'b.     Under the fee agreement, the respondent was allowed attempt to collect his fees from the opposing party through court ordered attorney fees or sanctions. This provision does not contemplate the respondent taking settlement proceeds, but rather allows the respondent to seek to obtain full payment through "attorney's fee provisions or sanctions."

'c.     The respondent justified retaining the settlement proceeds because his clients had not made their mortgage payments for an extended period of time and had thus, lived 'for free' for that period of time. The respondent asserted that his clients effectively received $2,200 each month that they did not pay their mortgage. While P.J. and D.R. did not pay their mortgage for an extended period of time, the settlement of the case resulted in his clients losing their home, including any equity they had accrued or appreciation that the house had gained.

'd.     The respondent's assertion that he was entitled to receive all the settlement proceeds is undercut by the respondent's communications to P.J. and D.R. After the parties entered into settlement negotiations, the mortgage company offered to settle the case by paying P.J. and D.R. $25,000. After the mortgage company made that offer, the respondent encouraged settlement and stated:

17

Under the settlement agreement as it stands, you would have been in your house for 5 years without making a payment. Owe nothing to EverBank and have $25K in your pocket if the loss mitigation options were not acceptable to you.

If, during settlement negotiations, the respondent expected to get the settlement proceeds because they came from a 'person other than the Clients,' the respondent would not have told P.J. and D.R. that they would have '$25K' in their pocket.

'e.     After settlement was imminent, the respondent made another statement to P.J. and D.R. which indicated that he expected that they would receive a portion of the fee. The respondent stated, "I don't like to count my chickens before they hatch, I will put together a disbursement summary that, hopefully, we can agree upon and we will have this part behind us."

'f.     At the hearing on this matter, the respondent asserted that P.J. and D.R. engaged in settlement negotiations so that he would receive more of his attorney fees paid, not so that they would receive a cash settlement.

Q.     Okay. At the point in time this final settlement is being negotiated, [D.R.] and [P.J.] had given you instructions to settle for $100,000 and then it was negotiated back and forth and all this kind of stuff. But the amount of fees that were outstanding were $160,000 or—you probably had some idea of what the round numbers were, you maybe hadn't computed it yet.

A.     Right.

Q.     So they would get zero wherever it was settled; am I correct?

A.     They could have gotten zero if it was settled for less than the amount of fees that were billed.

Q.      And that was 160,000 or it was—it would have been 160,000?

A.      Right.

Q.      Under those circumstances, they should settle for any amount of money, it matters not one iota, because they get no more or no less and if they don't settle, they risk additional damages and deficiencies and all these kinds of things; am I correct?

A.      Assuming that there were additional damages. The posture of the case at that time was that the foreclosure action had been ruled on. Both of them had filed bankruptcy, so to the extent that that applies and they wouldn't be subject to a deficiency judgment. And there was a question about whether they were—would be subject to attorney fees. You know, I certainly would have argued that EverBank would not have been entitled to collect its attorney fees, particularly in light of the posture and the facts of the case. But I wasn't going to say with any certainty that they could never get them.

Q.      So if they settled for zero, they get rid of all this risk?

A.      Right.

Q.      If they settle for $100,000, they still get zero and get rid of the risk. If they don't settle, they have that risk; is that correct?

A.      If they don't settle they have that risk, but they also have the possibility—the opportunity to recover more than the settlement amount.

19

Q.      So the only reason to argue for more money within that—say that zero to $100,000 range, is to help you?

A.      That's what my understanding was going on at the time.

The respondent's testimony is troubling to the hearing panel because it is inconsistent with other probative evidence. The respondent's testimony is also troubling to the hearing panel because the respondent did not keep contemporaneous time records, he did not bill his clients, and he never communicated the total amount of fees incurred in this case to his clients. If his fees were to come out of the settlement prior to his clients receiving any settlement proceeds then the amount of his fees would have been a vital piece of information for his clients to have before accepting any settlement offer.

'g.      At the hearing on this matter, the hearing panel was in a position to observe the witnesses as they each testified. Based on P.J. and D.R.'s appearance, the hearing panel does not believe that P.J. and D.R. negotiated the settlement from $25,000 to $49,999 so the respondent would receive more of his fees paid. It is clear, based on the appearance of the witnesses at the hearing, that P.J. and D.R. negotiated the settlement from $25,000 to $49,999 so that they would receive a larger amount of money on settlement.

'h.      After the case was settled and the check was cut, the respondent told his clients that he would pay them the day the bank released the funds. If the respondent believed that the entire amount of the settlement was to be used to pay his fees under the fee agreement, the respondent would not have made that statement.

'i.      Because P.J. and D.R. had to vacate their house as part of the settlement, while the funds were being held, D.R. requested that the respondent provide them with $3,000 to pay moving expenses. The respondent provided D.R. with a check for $3,000. If, under the fee agreement, the settlement proceeds were to be used to pay the respondent's fees first, the respondent would not have provided P.J. and D.R. with $3,000 for moving expenses.

20

'j.      After disbursing $3,000 to P.J. and D.R. for moving expenses, on September 2, 2015, the respondent asked how P.J. and D.R. proposed to allocate the remainder of the funds. If the respondent expected that the entire settlement was to be used to pay his fees under his contract, he would not have made that statement to P.J. and D.R.'

"52.      Based on the fee agreement and the respondent's subsequent communications with them, the hearing panel concludes that P.J. and D.R. were entitled to at least a portion of the remaining $43,000.

"53.      While the hearing panel concludes that the respondent was not entitled to retain the full $43,000, the hearing panel likewise concludes that P.J. and D.R. were also not entitled to the full balance of the settlement proceeds after the expenses had been deducted. Because the fee agreement did not provide for this type of resolution, the hearing panel cannot determine how the settlement proceeds should have been divided. It is unfortunate that the respondent did not participate in the fee dispute program as this would be precisely what that program is designed to address.

"Time Records

"54.      The respondent testified that approximately two weeks prior to the hearing on the formal complaint, the respondent completed drafting his billing records.

'Q.      Okay. I want to go to your billing invoices that you presented. When did you draft those?

'A.      Final version, within the last couple of weeks. I had started drafting them in late July of 2015 as we got ready for trial.

'Q.      And I understood your testimony earlier was that you recompiled them by looking at your texts to see—or your phone and looking at court dates. As far as working on motions, how did you come up with that time?

21

'A.     Typically I knew what my work schedule was, so I would work in the mornings and probably at times during noon and determine when I started working on those. And, you know, I'm a single guy, so—a solo practitioner, so if I'm working on one thing, I'm just working on that one thing before I put it away. So I knew the times that I was working. Okay. Then I would look at the motion and typically back off time for the motion, depending on the substance of the motion. I try not to bill more than half an hour or on[e] hour per page for a motion.

'Q.     Okay. Did you keep contemporaneous time records when you were working on a client matter?

'A.     If you're asking if I wrote down on that day 2.5, other than me knowing that I worked from 7 to 10 that day and that's the only part of— that's the only thing I worked on, the latter is how I billed.

'Q.     So I want to go back to my question. Did you keep contemporaneous time records? When you would work on a client matter, would you say—for example, if you started to work at 10 o'clock that day and then you worked on the [D.R.] matter for two hours, did you keep a time record that day where you said two hours on the [D.R.] matter?

'A.     Other than putting time in the Excel worksheet, no, when I did that.

'Q.     Do you have those worksheets?

'A.     The Excel worksheets, some, yes.'

"55.     The hearing panel is troubled by the respondent's billing practices. First, the respondent did not maintain contemporaneous time records. Attempting to create time records two years later is an inaccurate and unfair procedure to employ. Second, the

22

respondent testified that he generally charges one-half hour to one hour per page of a motion. Calculating an hourly fee based on the number of pages in a motion is improper. The respondent must bill by the hour and keep contemporaneous billing records in order to ensure that clients are properly billed.

## "Rule Violations

"56.      In the formal complaint and the first amended formal complaint, the disciplinary administrator alleged that the respondent violated KRPC 1.1, KRPC 1.3, KRPC 1.4, KRPC 1.5, KRPC 1.15, KRPC 1.16, KRPC 8.1, KRPC 8.4, and Kan. Sup. Ct. R. 207.

"57.      The disciplinary administrator withdrew the allegations that the respondent violated KRPC 1.1 and KRPC 1.5.

"58.      The respondent stipulated that he violated KRPC 8.1 and Kan. Sup. Ct. R. 207.

"59.      Thus, the hearing panel must determine whether the respondent violated KRPC 1.3, KRPC 1.4, KRPC 1.15, KRPC 1.16, and KRPC 8.4. Further, because the formal complaint sets forth facts to support a KRPC 1.5 violation, it is proper for the hearing panel to consider whether the respondent violated that rule, despite the disciplinary administrator's withdrawal of that violation. *State v. Caenen*, 235 Kan. 451, 458-59, 681 P.2d 639 (1984).

"60.      Based upon the findings of fact and the respondent's stipulations, the hearing panel concludes as a matter of law that the respondent violated KRPC 1.4(b), KRPC 1.5(d), KRPC 1.15(a), KRPC 1.15(b), KRPC 1.15(c), KRPC 1.15(d)(1)(ii), KRPC 1.15(d)(3), KRPC 1.15(f), KRPC 1.16(d), KRPC 8.1, and Kan. Sup. Ct. R. 207, as detailed below. The hearing panel concludes that the respondent did not violate KRPC 1.3 and KRPC 8.4.

23

"KRPC 1.4

"61.    KRPC 1.4(b) provides that '[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.' In this case, the respondent violated KRPC 1.4(b) when he failed to adequately communicate his position about what his clients would receive under the settlement. The fee agreement is intrinsically inconsistent, misleading, and incapable of being interpreted as a basis for fee determination. Accordingly, the hearing panel concludes that the respondent violated KRPC 1.4(b) by failing to properly explain the effect of settling the case.

"KRPC 1.5

"62.    The disciplinary administrator withdrew the allegation that the respondent violated KRPC 1.5. However, because sufficient facts were alleged in the formal complaint, it is appropriate for the hearing panel to, nevertheless, consider whether the respondent violated KRPC 1.5. *State v. Caenen*, 235 Kan. 451, 458-59, 681 P.2d 639 (1984).

"63.    Contingent fee agreements must be in writing. KRPC 1.5(d) provides the requirement in this regard:

'A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (f) or other law. A contingent fee agreement shall be in writing and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, and the litigation and other expenses to be deducted from the recovery. All such expenses shall be deducted before the contingent fee is calculated. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter and, if there is a recovery, showing the client's share and amount and the method of its

24

determination. The statement shall advise the client of the right to have the fee reviewed as provided in subsection (e).'

The respondent's fee agreement with P.J. and D.R. provided a monthly cap of $500 plus expenses plus a contingent success fee. However, when the settlement was received, the respondent indicated that he would be preparing a disbursement sheet. Agreeing to provide a disbursement sheet, reinforces that the respondent was treating the fee agreement with P.J. and D.R. as a contingent fee agreement. In order for an attorney to enter into a contingent fee agreement, the attorney must comply with KRPC 1.5. The respondent failed to do what KRPC 1.5 required him to do. The respondent failed to effectively put the contingent fee in writing, state the method by which the fee was to be determined, provide a written statement stating the outcome and showing the method of determining the recovery and fee, and inform the clients that they had the right to have the fee reviewed, as provided in KRPC 1.5(e). The respondent failed to provide P.J. and D.R. with a written statement stating the outcome of the matter, the client's share of the fee, and the method of its determination. Additionally, the respondent failed to advise the client of the right to have the fee reviewed by the court. Thus, the hearing panel concludes that the respondent violated KRPC 1.5(d).

"KRPC 1.15

"64.    Lawyers must properly safeguard their clients' property. KRPC 1.15(a) specifically provides that:

'A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state of Kansas. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.'

25

In this case, the respondent failed to properly safeguard P.J. and D.R.'s property. First, the respondent did not deposit the settlement proceeds into an appropriate attorney trust account. Rather, the respondent deposited the settlement proceeds into his operating account. Accordingly, the hearing panel concludes that the respondent failed to properly safeguard his client's settlement proceeds, in violation of KRPC 1.15(a).

"65.    Lawyers must deal properly with the property of their clients. Specifically, KRPC 1.15(b) provides:

'Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.'

The respondent violated KRPC 1.15(b) when he failed to render a full accounting of the settlement proceeds. Accordingly, the hearing panel concludes that the respondent violated KRPC 1.15(b).

"66.    KRPC 1.15(c) provides:

'When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.'

The respondent and his clients asserted that they were entitled to the settlement proceeds. Because there was a dispute as to who the proceeds should be distributed to, the respondent was required to keep the property separate until the dispute is resolved. The dispute remains today, but yet the respondent failed to keep the settlement proceeds in a

proper attorney trust account. The respondent failed to retain the funds to allow the dispute to be resolved. The hearing panel concludes that the respondent violated KRPC 1.15(c).

"67.     KRPC 1.15(d)(1)(ii) also prohibits lawyers from withdrawing funds from a trust account if the funds are disputed by the client. In this case, the respondent failed to ever deposit the funds into a property trust account. Additionally, the funds no longer remain in the respondent's operating account. Accordingly, the hearing panel concludes that the respondent violated KRPC 1.15(d)(1)(ii).

"68.     In Kansas, attorneys are required to keep client funds in a trust account with a bank which has been approved as a depository for lawyer trust accounts. At the hearing on this matter, the respondent admitted that he was unaware that he had to have his trust account in a bank approved by the disciplinary administrator's office. The respondent violated KRPC 1.15(d)(3) and KRPC 1.15(f) when he held P.J. and D.R.'s funds in an operating account rather than in an attorney trust account with a bank which was approved as a depository for lawyer trust accounts.

"KRPC 1.16

"69.     KRPC 1.16 requires lawyers to take certain steps to protect clients after the representation has been terminated. Specifically, KRPC 1.16(d) provides the requirement in this regard:

'Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law.'

27

The respondent violated KRPC 1.16(d) when he failed to surrender the settlement proceeds which P.J. and D.R. were entitled to receive. The hearing panel concludes that the respondent repeatedly violated KRPC 1.16(d).

"KRPC 8.1 and Kan. Sup. Ct. R. 207(b)

"70. Lawyers must cooperate in disciplinary investigations. KRPC 8.1(b) and Kan. Sup. Ct. R. 207(b) provide the requirements in this regard. '[A] lawyer in connection with a . . . disciplinary matter, shall not: . . . knowingly fail to respond to a lawful demand for information from [a] . . . disciplinary authority, . . .' KRPC 8.1(b).

'It shall be the duty of each member of the bar of this state to aid the Supreme Court, the Disciplinary Board, and the Disciplinary Administrator in investigations concerning complaints of misconduct, and to communicate to the Disciplinary Administrator any information he or she may have affecting such matters.' Kan. Sup. Ct. R. 207(b).

The respondent stipulated that he violated KRPC 8.1(b) and Kan. Sup. Ct. R. 207(b) by failing to cooperate in the disciplinary investigation. The evidence before the hearing panel supports the respondent's stipulation. The respondent knew that he was required to forward a written response to the initial complaints—he had been repeatedly instructed to do so in writing by the disciplinary administrator and the attorney investigator. Because the respondent knowingly failed to provide a written response to the initial complaint filed by P.J. and D.R., the hearing panel concludes that the respondent violated KRPC 8.1(b) and Kan. Sup. Ct. R. 207(b).

"*American Bar Association*
*Standards for Imposing Lawyer Sanctions*

"71. In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual

28

injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"72.    *Duty Violated*. The respondent violated his duty to his client to provide adequate communication. The respondent violated his duty to his client to properly safeguard his client's property. Finally, the respondent violated his duty to the legal profession to cooperate in disciplinary investigations.

"73.    *Mental State*. The respondent knowingly violated his duties.

"74.    *Injury*. As a result of the respondent's misconduct, the respondent caused actual injury to his clients and to the legal profession.

"75.    *Aggravating and Mitigating Factors*. Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

'a.    Dishonest or Selfish Motive. The respondent retained $43,000 of the settlement. While the respondent spent significant time on the case, the respondent's fee agreement did not provide for the respondent to retain settlement proceeds. Accordingly, the hearing panel concludes that the respondent's misconduct was motivated by selfishness.

'b.    Multiple Offenses. The respondent committed multiple rule violations. The respondent violated KRPC 1.4, KRPC 1.5, KRPC 1.15, KRPC 1.[1]6, KRPC 8.1, and Kan. Sup. Ct. R. 207. Accordingly, the hearing panel concludes that the respondent committed multiple offenses.

'c.    Bad Faith Obstruction of the Disciplinary Proceeding by Intentionally Failing to Comply with Rules or Orders of the Disciplinary Process. The respondent failed to provide written responses to the complaints in this case. The respondent was repeatedly instructed to provide written responses. The respondent's repeated failure to provide written responses to the complaint

29

amounts to bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules and orders of the disciplinary process.

'd.     Submission of False Evidence, False Statements, or Other Deceptive Practices During the Disciplinary Process. During the hearing, the respondent provided a copy of documents which purport to be client billing statements. However, during the hearing, the respondent testified that he finished drafting the billing records in May, 2017. The hearing panel finds that drafting billing statements in May, 2017 for work purportedly performed from April, 2014, through July, 2015, is deceptive.

'e.     Refusal to Acknowledge Wrongful Nature of Conduct. The respondent has refused to acknowledge any wrongdoing as it relates to his representation of P.J. and D.R. and his retention and use of the settlement proceeds. The only misconduct the respondent acknowledged was his failure to cooperate in the disciplinary investigation. Throughout the hearing and prior, the respondent showed absolutely no remorse for his wrongful actions nor sympathy for the injury experienced by his clients.

'f.     Substantial Experience in the Practice of Law. The Kansas Supreme Court admitted the respondent to practice law in the State of Kansas in 1994. At the time of the misconduct, the respondent has been practicing law for more than twenty years.

'g.     Indifference to Making Restitution. P.J. and D.R. did what they could to resolve the dispute. They filed a motion in district court seeking to resolve the issue. P.J. and D.R. sought the assistance of the Kansas City Metropolitan Bar Association's Fee Dispute Committee. The respondent should have participated in the fee dispute process. Had the respondent participated in the fee dispute process, that entity could have determined whether the respondent was entitled to keep any money. By refusing to participate in the fee dispute process, the respondent demonstrated his indifference to making restitution to P.J. and D.R.'

30

"76.     Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating factor:

'a.     Absence of a Prior Disciplinary Record. The respondent has not previously been disciplined.'

"77.     In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'4.12     Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client.

'5.11     Disbarment is generally appropriate when:

. . . .

(b)     a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that serious adversely reflects on the lawyer's fitness to practice.

'7.2     Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.'

"*Recommendation*

"78.     The disciplinary administrator recommended that the respondent be disbarred. Respondent's counsel acknowledged that the respondent's failure to cooperate

31

supports a suspension. While the respondent provided a proposed plan of probation, counsel for the respondent did not argue that the respondent should be placed on probation because the respondent does not intend to practice law. The respondent would like to continue working in his position as a contract administrator.

"79.    Accordingly, based upon the findings of fact, conclusions of law, and the Standards listed above, the hearing panel unanimously recommends that the respondent be suspended for a period of two years. The hearing panel further recommends that prior to reinstatement, the respondent be required to undergo a reinstatement hearing under [] Kan. Sup. Ct. R. 219.

"80.    Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator."

DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the hearing panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f) (2018 Kan. S. Ct. R. 251). Clear and convincing evidence is "'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

*Uncontested Rule Violations*

We begin with the uncontested portion of this proceeding. Respondent was given adequate notice of the formal complaint and first amended formal complaint, to which he filed answers. Respondent was also given adequate notice of the hearing before the panel and the hearing before this court. The respondent did not file exceptions to the hearing

32

panel's final hearing report; therefore, the panel's findings of fact are deemed admitted. Supreme Court Rule 212(c), (d). Furthermore, the evidence before the hearing panel establishes by clear and convincing evidence that the charged misconduct violated KRPC 1.4(b) (2018 Kan. S. Ct. R. 293) (communication); 1.5(d) (2018 Kan. S. Ct. R. 294) (fees); 1.15(a), (b), (c), (d)(1)(ii), (d)(3), and (f) (2018 Kan. S. Ct. R. 328) (safekeeping property); 1.16(d) (2018 Kan. S. Ct. R. 333) (termination of representation); 8.1(b) (2018 Kan. S. Ct. R. 379) (failure to respond to lawful demand for information from a disciplinary authority); and Kansas Supreme Court Rule 207(b) (2018 Kan. S. Ct. R. 246) (failure to cooperate in disciplinary investigation), and supports the panel's conclusions of law with regard to these rule violations.

*The hearing panel's findings of fact support a conclusion of law that respondent violated KRPC 8.4(c).*

We turn now to the Deputy Disciplinary Administrator's argument that the panel erred in concluding that the respondent did not violate KRPC 8.4(c). We agree and hold the panel's factual findings support a conclusion, as a matter of law, that respondent violated KRPC 8.4(c).

KRPC 8.4(c) states: "It is professional misconduct for a lawyer to: . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation." (2018 Kan. S. Ct. R. 381). This rule is identical to Model Rule of Professional Conduct 8.4(c). See American Bar Association: Annotated Model Rules of Professional Conduct (8th ed. 2015) (AMRPC), Rule 8.4(c), Misconduct, p. 669. Both the KRPC and the model rules define "fraud" as "conduct that is fraudulent under the substantive or procedural law of the applicable jurisdiction and has a purpose to deceive." KRPC 1.0(e) (2018 Kan. S. Ct. R. 286); AMRPC 1.0(d), p. 15. The KRPC and the model rules do not define the terms "dishonesty," "deceit," and "misrepresentation," but the annotation to the model rules provides the following discussion of these terms:

33

"One court explained the difference by concluding that fraud and deceit require an intent to deceive, but misrepresentation does not, and that dishonesty involves 'conduct indicating a disposition to "lie, cheat or defraud."' *In re Obert*, 89 P.3d 1173 (Or. 2004); *see In re Scanio*, 919 A.2d 1137 (D.C. 2007) ('dishonesty' includes 'conduct evincing a lack of honesty, probity or integrity in principle; a lack of fairness and straightforwardness,' but need not involve conduct legally characterized as fraud, deceit, or misrepresentation). *See generally Fla. Bar v. Ross*, 732 So. 2d 1037 (Fla. 1998) ('dishonesty' not unconstitutionally vague; 'a person of common intelligence could be expected to understand the conduct proscribed by the rule')." AMRPC 8.4, p. 678-79.

Additionally, the model rule's annotation provides subsection (c)'s prohibition is broad. With respect to dishonesty towards clients, the annotation provides, "A lawyer may not mislead or lie to a client." AMRPC 8.4, p. 680.

We hold the factual findings in the panel's final hearing report, especially findings 51(a)-(j) quoted above, support a conclusion of law that the respondent violated KRPC 8.4(c). These factual findings show that respondent was dishonest with his clients and with the hearing panel and that, at the very least, he misled his clients into settling the lawsuit for the respondent's benefit.

Without reiterating all of the panel's findings, we highlight that the respondent encouraged his clients to accept the mortgage company's $25,000 settlement offer by explaining, "'[u]nder the settlement agreement as it stands, you would . . . [o]we nothing to EverBank *and have $25K in your pocket* . . . .'" (Emphasis added.) As the panel realized, "[i]f, during settlement negotiations, the respondent expected to get the settlement proceeds because they came from a 'person other than the Clients,' the respondent would not have told P.J. and D.R. that they would have '25K' in their pocket." The hearing panel further recognized that respondent's testimony that P.J. and D.R. engaged in settlement negotiations so respondent would get more of his attorney fees

34

paid, not so P.J. and D.R. would receive a cash settlement, was "troubling . . . because it is inconsistent with other probative evidence." The hearing panel found "based on the appearance of the witnesses at the hearing, [] P.J. and D.R. negotiated the settlement from $25,000 to $49,999 so that they would receive a larger amount of money on settlement."

Further, the panel found "[a]fter the case was settled and the check was cut, the respondent told his clients that he would pay them the day the bank released the funds." And after respondent received the settlement check, at P.J. and D.R.'s request, the respondent provided them with a check for $3,000. Based on its assessments of the evidence, the hearing panel reasoned, "[i]f, under the fee agreement, the settlement proceeds were to be used to pay the respondent's fees first, the respondent would not have provided P.J. and D.R. with $3,000 for moving expenses." Moreover, after disbursing these funds, respondent asked P.J. and D.R. how they proposed to allocate the remainder of the funds. The hearing panel reasoned, "[i]f the respondent expected the entire settlement was to be used to pay his fees under his contract, he would not have made that statement."

We cannot reconcile respondent's statements to his clients and actions with respect to the settlement funds with respondent's representations to the hearing panel without determining that the respondent was dishonest with his clients and the hearing panel and misled his clients into settling the lawsuit for his benefit. Accordingly, we unanimously hold that the panel's factual findings, which respondent took no exception to, support the legal conclusion that respondent violated KRPC 8.4(c). Therefore, we need not address the Disciplinary Administrator's alternative argument to look beyond these factual findings for additional evidence in the record establishing a violation of KRPC 8.4(c).

35

DISCIPLINE

Having found violations of the KRPC, we must determine the appropriate discipline. As set forth above, respondent's violations are KRPC 1.4(b) (2018 Kan. S. Ct. R. 293) (communication); 1.5(d) (2018 Kan. S. Ct. R. 294) (fees); 1.15(a), (b), (c), (d)(1)(ii), (d)(3), and (f) (2018 Kan. S. Ct. R. 328) (safekeeping property); 1.16(d) (2018 Kan. S. Ct. R. 333) (termination of representation); 8.1(b) (2018 Kan. S. Ct. R. 379) (failure to respond to lawful demand for information from a disciplinary authority); 8.4(c) (misconduct); and Kansas Supreme Court Rule 207(b) (2018 Kan. S. Ct. R. 246) (failure to cooperate in disciplinary investigation).

Before the hearing panel, the Deputy Disciplinary Administrator recommended that the respondent be disbarred. Respondent's counsel conceded that respondent's failure to cooperate in the disciplinary proceeding warranted suspension. The hearing panel recommended that respondent be suspended for two years, and that he be required to undergo a reinstatement hearing under Rule 219. Respondent asks this court to uphold the hearing panel's recommended sanction while the Deputy Disciplinary Administrator continues to argue that disbarment is the appropriate sanction.

This court is not bound by the recommendations made by the Disciplinary Administrator or the hearing panel. Supreme Court Rule 212(f) (2018 S. Ct. R. 255). Instead, this court bases each disciplinary sanction on the specific facts and circumstances of the violations and the aggravating and mitigating circumstances presented in the case. *In re Mintz*, 298 Kan. 897, 912, 317 P.3d 756 (2014). While prior cases may have some bearing on the sanctions that this court elects to impose, those prior cases must give way to consideration of the unique circumstances that each individual case presents. *In re Knox*, 305 Kan. 628, 641-42, 385 P.3d 500 (2016).

36

Although not mandated by this court's rules, this court historically looks to the American Bar Association Standards for Imposing Lawyer Sanctions (ABA Standards) to guide our determination of the appropriate discipline to impose. *In re Harrington*, 305 Kan. 643, 659, 385 P.3d 905 (2016) (citing *In re Hawkins*, 304 Kan. 97, 140, 373 P.3d 718 [2016]). Under the ABA Standards, the sanctioning factors to be considered are the ethical duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors. *Hawkins*, 304 Kan. at 140 (citing ABA Standard 3.0).

*The Ethical Duties Violated*

The hearing panel concluded that respondent violated his duty of communication, his duty to properly safeguard his clients' property, and his duty to the legal profession to cooperate in disciplinary investigations.

The hearing panel's findings are supported by the evidence, but we discern that they are incomplete. In addition, the respondent violated his duty to his clients by failing to comply with the requirements for a contingency fee agreement, failing to render a full accounting of settlement proceeds, failing to retain and keep disputed funds in an approved attorney trust account, and repeated failure to surrender settlement proceeds to his clients. And finally, the respondent violated his duties to his clients and the legal profession by engaging in dishonest and misleading conduct towards his clients and the hearing panel.

*Respondent's Mental State*

The hearing panel found "respondent knowingly violated his duties." "The ABA Standards identify three mental states:  'intent,' the highest culpable mental state; 'knowledge,' the intermediate culpable mental state; and 'negligence,' the least culpable

mental state." 304 Kan. at 141. The ABA Standards define intent as "the conscious objective or purpose to accomplish a particular result," while knowledge is defined as "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." American Bar Association Annotated Standards for Imposing Lawyer Sanctions, xxi (2015).

The Deputy Disciplinary Administrator argues that the respondent intentionally violated his duties, pointing out the panel's final hearing report finding that "[t]he respondent's repeated failure to provide written responses to the complaint amounts to bad faith obstruction of the disciplinary proceeding by *intentionally* failing to comply with rules and orders of the disciplinary process." (Emphasis added.) It is difficult to square this finding with the panel's holding that the respondent "knowingly" violated this duty.

Furthermore, with respect to the violation of failing to safeguard a client's property, respondent argues that "[i]t is clear that [he] intended to disburse the settlement proceeds, but, after an unreasonable fee dispute, did not." That argument establishes that respondent commingled the settlement funds with his personal monies and expended the entire amount despite knowing that some of the money should have been disbursed to his clients, or at least that his clients were claiming entitlement to some of the funds. Such conduct is intentional.

Finally, respondent's communications with his clients manifest a conscious objective or purpose to mislead his clients as to the effect the settlement would have on the clients' financial situation. Again, such conduct is intentional.

*Injury from the Misconduct*

The panel concluded that respondent's conduct resulted in actual injury to his clients and the legal profession. We agree.

*Aggravating and Mitigating Circumstances*

This court's rules require that a disciplinary panel explain "[m]itigating or aggravating circumstances which affect the nature or degree of discipline." Supreme Court Rule 211(f) (2018 Kan. S. Ct. R. 252). The panel must consider the evidence presented as to aggravating and mitigating circumstances and determine the weight to be assigned to each in arriving at an appropriate discipline. *In re Walsh*, 286 Kan. 235, 248, 182 P.3d 1218 (2008). On appeal, this court determines whether it agrees with the panel's findings regarding aggravating and mitigating circumstances. *Hawkins*, 304 Kan. at 142.

The hearing panel found the following aggravating circumstances were present: (1) Dishonest or Selfish Motive; (2) Multiple Offenses; (3) Bad Faith Obstruction of the Disciplinary Proceeding by Intentionally Failing to Comply with Rules or Orders of the Disciplinary Process; (4) Submission of False Evidence, False Statements, or Other Deceptive Practices During the Disciplinary Process; (5) Refusal to Acknowledge Wrongful Nature of Conduct; (6) Substantial Experience in the Practice of Law; and (7) Indifference to Making Restitution. The panel additionally found one mitigating circumstance: Absence of a Prior Disciplinary Record.

On appeal, the Deputy Disciplinary Administrator challenges the panel's finding regarding the aggravating factor of Dishonest or Selfish Motive, arguing the panel erred in only finding respondent acted selfishly because respondent's conduct was also

motivated by dishonesty. Based on our holding above that the respondent violated KRPC 8.4(c), we agree.

*The Appropriate Discipline is Disbarment*

ABA Standard 4.1—Violations of Duties Owed to Clients—Failure to Preserve the Client's Property, provides, in relevant part: "4.11 Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client." Likewise, "Kansas disciplinary cases have consistently recognized that misappropriation of clients' funds is one of the most serious offenses an attorney can commit and the sanction generally imposed has been disbarment." *In re Veith*, 252 Kan. 266, 272, 843 P.2d 729 (1992). Here, money that respondent admittedly intended to disburse to his clients was commingled with his own funds, instead of being safeguarded in a trust account, and respondent used the funds for his own benefit. Disbarment is appropriate for such a conversion.

A majority of the court concludes that the severity of respondent's conduct warrants disbarment. A minority of the court would impose indefinite suspension and require a reinstatement hearing under Rule 219 (2018 Kan. Ct. R. 264) at which Respondent would be required to prove that full restitution has been provided to his clients and the Client Protection Fund, if applicable.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that L.J. Buckner, Jr. be and he is hereby disbarred from the practice of law in the state of Kansas, effective on the filing of this opinion, in accordance with Supreme Court Rule 203(a)(1) (2018 Kan. S. Ct. R. 234).

IT IS FURTHER ORDERED that the Clerk of the Appellate Courts strike the name of L.J. Buckner, Jr. from the roll of attorneys licensed to practice law in Kansas.

IT IS FURTHER ORDERED that the respondent shall comply with Supreme Court Rule 218 (2018 Kan. S. Ct. R. 262).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.